UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

TONY C. FRANKLIN,

                    Plaintiff,

        v.                                          Case No. 18-cv-1730-pp

JEFFREY MANLOVE, CHRYSTAL MELI,
and BRIAN FOSTER,

                    Defendants.

## ORDER GRANTING DEFENDANTS' UNOPPOSED MOTION FOR SUMMARY JUDGMENT (DKT. NO. 91) AND DISMISSING CASE

Plaintiff Tony C. Franklin, who is incarcerated at Kettle Moraine Correctional Institution and who is representing himself, is proceeding on claims under 42 U.S.C. §1983 that the defendants violated his Eighth Amendment rights by showing deliberate indifference to his serious medical needs. On September 17, 2021, the court granted partial summary judgment in favor of defendants Kyle Demers and Joel Sankey on the grounds that the plaintiff failed to exhaust his administrative remedies for his claims against those defendants. Dkt. No. 89. The remaining defendants move for summary judgment on the merits of the plaintiff's remaining claims. Dkt. No. 91. The plaintiff has not opposed the motion. The court finds that the defendants are entitled to judgment as a matter of law and dismisses the case.

I.      **Facts**

        A.      Procedural Background

The court recounted the procedural history of this case in its September 2019 order granting summary judgment as to defendants Demers and Sankey.

Dkt. No. 89 at 1–3. This section details only what has occurred since the court entered that order.

On September 21, 2021, the court issued an amended scheduling order setting new deadlines for the parties to complete discovery and file dispositive motions on the merits of the plaintiff's claims. Dkt. No. 90. The court ordered the parties to complete discovery by February 18, 2022 and to file dispositive motions by March 21, 2022. Id. At the March 21, 2022 deadline, the defendants filed a motion for summary judgment on the merits of the plaintiff's remaining claims. Dkt. No. 91.

On April 19, 2022, the plaintiff's counsel filed a proposed stipulation extending the plaintiff's deadline to respond to the summary judgment motion until the end of the day on May 4, 2022. Dkt. No. 99. Counsel explained that the stipulated extension would "allow plaintiff sufficient time to fully evaluate the allegations in the motion, discuss said allegations with his counsel, and discuss said allegations with his retained expert." Id. at 1. On April 21, 2022, the court approved the stipulation and ordered the plaintiff to file his response to the summary judgment motion by the end of the day on May 4, 2022. Dkt. No. 100.

At the May 4, 2022 deadline, the plaintiff's counsel filed a second proposed stipulation extending the plaintiff's deadline to respond to the defendants' motion until May 10, 2022. Dkt. No. 102. Counsel explained they needed additional "time to consult with their client, who is incarcerated and has limited access to telephone calls, regarding the matters raised in the motion and an appropriate response thereto." Id. at 1. The court approved the second stipulation and ordered the plaintiff to respond to the defendants' motion by the end of the day on May 10, 2022. Dkt. No. 103.

On May 9, 2022, the plaintiff's counsel filed a motion to withdraw and to stay the proceedings. Dkt. No. 104. Counsel explained that after discussing with the plaintiff an appropriate response to the defendants' motion, they had determined that the plaintiff "does not agree with the manner in which his attorneys advise him to proceed and has decided to either return to representing himself *pro se* in this action or to seek alternate counsel." Id. at ¶5. Counsel cited "a breakdown in the attorney/client relationship" as good cause to allow them to withdraw from further representation. Id. at ¶¶6–7.

Finding "the relationship between the plaintiff and his attorneys is irreparably broken," the court granted counsels' motion and terminated them as counsel of record. Dkt. No. 105 at 3. The court denied counsels' request to stay the proceedings to allow the plaintiff to recruit new counsel and advised the plaintiff that he would "return to *pro se* status and [would] be responsible for representing himself going forward." Id. at 3–4. The court extended the plaintiff's time to respond to the defendants' summary judgment motion to June 24, 2022. Id. at 4. The court explained the procedures the plaintiff must follow in responding to the defendants' motion. Id. The court further advised the plaintiff:

> If the court has not received the plaintiff's opposition brief and supporting materials by the end of the day on June 24, 2022, the court has the authority to treat the defendants' motion as unopposed, accept all facts asserted by the defendants as undisputed and decide the motion based only on the arguments in the defendants' brief, without any input from the plaintiff. That means that the court likely will grant the defendants' motion and dismiss the case.

Id. at 4–5. The court sent that order to the plaintiff at Kettle Moraine Correctional Institution, where he is incarcerated. Id. at 5.

The June 24, 2022 deadline has passed, and the plaintiff has not filed a response to the defendants' motion or explained why he cannot do so. The court's previous order was not returned to the court as undeliverable, and the Wisconsin Department of Corrections offender search webpage shows the plaintiff is still at Kettle Moraine. See https://appsdoc.wi.gov/lop/home/home. The court has no indication that the plaintiff did not receive its previous order setting the June 24, 2022 deadline for his response to the defendants' motion and explaining the consequences of his failure to respond. The court will treat the defendants' motion as unopposed and decide it based only on the defendants' filings.

B.  Factual Background

The plaintiff was incarcerated at Waupun Correctional Institution at all relevant times. Dkt. No. 92 at ¶1. Brian Foster was the warden at Waupun from January 2016 until May 2021. Id. at ¶2. Dr. Jeffrey Manlove is a licensed physician and was employed as such at Waupun from January 2013 until June 3, 2020. Id. at ¶3. Chrystal Meli is a licensed registered nurse and was employed as the Nursing Supervisor/Health Services Unit ("HSU") Manager at Waupun from December 11, 2016, until September 25, 2020. Id. at ¶4.

The court allowed the plaintiff to proceed on Eighth Amendment deliberate indifference claims against the defendants. Id. at ¶5; Dkt. No. 61 at 8–9. The plaintiff alleges that Manlove provided inadequate treatment for his back pain from June 2015 through August 2018; that Meli failed to address his complaints of back pain and correct Manlove's allegedly deficient care; and that Foster failed to address Manlove's inadequate care and refused to reevaluate the pain medication the plaintiff was allowed to receive at Waupun. Dkt. No. 92 at ¶5; Dkt. No. 61 at 4–6.

4

1.   *Health Services Unit At Waupun*

Nursing staff and advanced care providers (physicians, nurse practitioners and so on) in the HSU consult with outside treatment providers and provide medical diagnoses, care and treatment for incarcerated persons. Dkt. No. 92 at ¶¶6, 8–9. Medical staff finalize treatment decisions and care plans are write prescriptions. Id. at ¶9. Nurses in the HSU provide treatment for back and neck pain as is appropriate, including heat or ice therapy, Tylenol, ibuprofen and muscle rub cream. Id. at ¶12. Nursing staff are responsible for placing patients on an advanced care provider's schedule to be seen based on their medical needs. Id. at ¶18.

Incarcerated persons may submit a Health Services Request to the HSU for treatment requests or information about their treatment. Id. at ¶13. HSU nursing staff triage those requests and make appointments based on need and their training and judgment. Id. at ¶15. Staff responses explain whether the incarcerated person will be seen, whether the request has been referred to another staff member or for a record review or whether information has been attached. Id. at ¶17. The responding staff also may include written comments. Id.

Department of Corrections policies dictate how advanced care providers may obtain approval to refer an incarcerated person off-site for non-emergency medical care. Id. at ¶19. A physician who determines that off-site medical care is required must submit a "Prior Authorization for Non-Urgent Care" request to the Bureau of Health Services' Medical Director. Id. at ¶20. The Medical Director will notify the physician whether the request is approved or denied or if more information is needed. Id. If the request is approved, the prison's HSU scheduler will make an appointment for the incarcerated person to be seen by

an off-site consulting physician. Id. at ¶21. HSU staff have no control over off-site physicians' schedules or availability. Id.

The consulting physician may make recommendations about the incarcerated person's course of treatment. Id. at ¶22. Those recommendations are forwarded to the incarcerated person's primary care physician at the institution. Id. The institution physician is not bound by the treatment recommendations and may adopt or reject all or any of the recommendations based on his or her own medical judgment, security concerns or other institutional concerns. Id. at ¶23.

Defendant Meli's position was administrative, so she did not evaluate, diagnose or treat incarcerated persons or prescribe medications, nor did she refer incarcerated persons to off-site providers or approve treatment recommendations. Id. at ¶7. She instead deferred to advanced care providers' medical decisions. Id. at ¶10. Meli did not supervise advanced care providers and had no authority to override their prescriptions. Id. at ¶11. Advanced care providers report to the Medical Director of Corrections' Bureau of Health Services (who is neither named as a defendant in this lawsuit nor a party to it). Id. Meli did not review health services requests unless nursing staff forwarded one to her for review of a particular issue. Id. at ¶16. As the warden, defendant Foster did not provide medical care to incarcerated persons and instead deferred to medical staff at the prison and to their decisions regarding incarcerated persons' medical treatment. Id. at ¶122.

2.    *The Plaintiff's Medical Treatment at Waupun*

a.    Early Treatment

As early as April 2014, Manlove provided the plaintiff an active prescription for gabapentin for treatment of his neurogenic pain. Id. at ¶38;

6

Dkt. No. 93-2 at 55. But the plaintiff continued to complain about pain, and CT results were consistent with left radicular (nerve) symptoms. Dkt. No. 92 at ¶40. Manlove notes that the plaintiff's pain had not improved after taking several medications, including non-steroidal anti-inflammatory drugs (NSAIDs), amitriptyline, duloxetine and others. Id. Manlove prescribed a trial of gabapentin and titrated the dosage up over time. Id.; Dkt. No. 93-2 at 54–56 (progress notes), 82–86 (prescriber's orders), 186–89 (CT scan reports), 205–18 (plaintiff's medication profile).

On June 12, 2015, the plaintiff saw Dr. John K. Choi at Waupun Memorial Hospital. Dkt. No. 92 at ¶25. Choi reviewed a CT scan of the plaintiff's lumbar spine and reported that the results were "not all that remarkable; but on examination of the images, there appears to be several levels of disk displacement." Id.; Dkt. No. 93-2 at 111. Choi also noted "bullet fragments or foreign bodies in the right L3-4 neural foramen." Dkt. No. 93-2 at 111. Choi discussed treatment options with the plaintiff during this appointment. Dkt. No. 92 at ¶41. He suggested a lumbar interlaminar epidural steroid injection, but the plaintiff declined and asked "to think about his options and he [would] follow up with the pain clinic at his convenience." Id.; Dkt. No. 93-2 at 111.

Choi diagnosed the plaintiff with "Cervical disk displacement." Dkt. No. 93-2 at 111. Manlove avers, however, that the diagnosis "was a typo" because Choi "only refers to the lumbar spine in his report." Dkt. No. 95 at ¶15. Manlove notes that the plaintiff did not receive a CT scan of his cervical spine until January 2019, so Choi must have meant to diagnose the plaintiff with lumbar disk displacement in June 2015. Id. Manlove avers that following a diagnosis of lumbar disk displacement, the first step of treatment is to

7

examine the patient to assess the severity and establish if it is symptomatic or debilitating. Id. at ¶16. The standard of care for treatment is to start with conservative measures, such as ice or topical medications along with over-the-counter pain relievers or NSAIDs. Id. If conservative treatment is inadequate, Manlove may prescribe physical therapy if it is available in a prison setting. Id. Manlove also often refers patients to a spine clinic or pain management specialist. Id. The specialist's recommendations are useful when devising a treatment plan. Id. He notes that epidural steroid injections can help reduce inflammation, which in turn reduces pain. Id.

Manlove says he next would prescribe medications to relieve neurogenic pain, such as gabapentin or pregabalin. Id. at ¶17. He explains that these medications may be effective but have an increased risk of abuse, so incarcerated persons may hoard or divert the medications for secondary gain. Id. Manlove notes that gabapentin is specifically indicated for use in treating neurogenic pain and can be a long-term medication, if it is effective. Id. at ¶20. He avers that narcotic analgesics have limited and diminishing value in treating chronic neurogenic pain, so he avoided prescribing them. Id. at ¶17. If this treatment fails, the final resort is a surgical referral for fusion or laminectomy. Id. at ¶18. Manlove qualifies his remarks by noting that treatment is variable and depends on the patient. Id. at ¶19. He says he generally would allow "at least a few weeks" of one treatment before moving onto the next step. Id.

            b.      June 2015 through December 2016

A June 16, 2015 entry in the plaintiff's "Prescriber's Orders" notes the plaintiff's request "to think about" the injection Choi recommended at the June 12, 2015 appointment. Dkt. No. 93-2 at 81. The order reads, "reschedule as

needed." Id. It is not clear who wrote this order. But the same day, the plaintiff saw Nurse Slinger (not a defendant) in the HSU. Dkt. No. 92 at ¶42. The plaintiff asked to return to Choi for the steroid injection. Id.; Dkt. No. 93-2 at 53. The next day, Manlove wrote an order to reschedule the steroid injection with Choi. Dkt. No. 92 at ¶43; Dkt. No. 93-2 at 81.

On July 20, 2015, the plaintiff saw another nurse at the HSU for medical clearance before his transfer to the Wisconsin Resource Center. Dkt. No. 92 at ¶44; Dkt. No. 93-2 at 53. The nurse advised the plaintiff "to be proactive and upon transfer alert staff re: steroid injection." Dkt. No. 93-2 at 53. The plaintiff was transferred on September 17, 2015, but he returned to Waupun on October 21, 2015. Dkt. No. 92 at ¶45. The day he returned, he wrote to the HSU asking to be scheduled for a "pain injection" in his back. Id. at ¶46; Dkt. No. 93-3 at 59. A nurse responded that she would schedule an appointment with Waupun Memorial Hospital. Dkt. No. 93-3 at 59. Manlove added a prescription for meloxicam for the plaintiff's pain. Dkt. No. 93-2 at 75.

On December 4, 2015, the plaintiff saw Choi at Waupun Hospital for a lumbar steroid injection to treat the plaintiff's "Lumbar disk displacement." Dkt. No. 92 at ¶48; Dkt. No. 93-2 at 107–09. Manlove saw the plaintiff a week later, and the plaintiff reported he was "doing much better but still having radicular pain" and requested an increase in gabapentin. Dkt. No. 93-2 at 38. Manlove granted that request and increased the plaintiff's gabapentin. Id. He also ordered physical therapy for core strengthening. Id.

The plaintiff saw a physical therapist (not a defendant) seven times at Waupun between January and March 2016. Dkt. No. 92 at ¶51. The physical therapist noted that the plaintiff "gained short-term symptom relief from PT intervention but minimal overall change" and "made moderate progress in

improving functional ROM [range of motion]." Dkt. No. 93-2 at 101. The therapist discharged the plaintiff to independent management, noting he had "reached the maximum number of authorized visits and likely would not substantially benefit from continued care." Id.

On April 14, 2016, the plaintiff saw Manlove and reported continued lower back pain, but he explained he was still "able to function well." Dkt. No. 92 at ¶53; Dkt. No. 93-2 at 37. Manlove noted the plaintiff was in no apparent distress, had good spinal range of motion and normal motor strength and showed deep tendon reflexes in his lower extremities. Dkt. No. 95 at ¶29. He added Tylenol to the plaintiff's prescriptions. Id.; Dkt. No. 93-2 at 37. On June 3, 2016, the plaintiff saw Manlove again. Dkt. No. 92 at ¶55; Dkt. No. 93-2 at 37. The plaintiff complained of lower back pain and nerve pain. Dkt. No. 95 at ¶30. He reported that the gabapentin helped his nerve pain, but that the injection and Tylenol did not. Id. Given the plaintiff's persistent back pain after the previous treatments, Manlove referred the plaintiff to the University of Wisconsin Spine Clinic for further evaluation and ordered a TENS unit for the plaintiff's pain. Id.; Dkt. No. 93-2 at 69, 97. The plaintiff's appointment was scheduled for December 9, 2016. Dkt. No. 95 at ¶30; Dkt. No. 93-2 at 97.

On December 9, 2016, the plaintiff saw Dr. Miranda Bice (not a defendant) at the Spine Clinic. Dkt. No. 92 at ¶57; Dkt. No. 93-2 at 92–96. Bice noted that the plaintiff reported his pain was "appropriately treat[ed]" by a doctor before he was incarcerated. Dkt. No. 93-2 at 94. He said that doctor had given him narcotic medication, including "hydrocodone on a regular basis." Id. He insisted that "the providers at the prison . . . have been negligent to date for inadequately treating his pain since his reincarceration." Id. Bice concluded that the plaintiff did not have "any pathology that would be amenable to

surgical intervention." Id. She noted that the shrapnel in his right side was inconsistent with the pain he experienced on his left side, and he had no motor difficulties. Id. Bice wrote that she "did try to explain this to him in so many ways; however, he was essentially disinterested in listening to it and felt that he was again being ignored and mistreated." Id. When Bice explained that surgery "would not predictably help him," the plaintiff "raised his voice, so [Bice] left the room." Id. She asked that he "be discharged from [the] clinic as [it had] no intervention for him." Id.

        c.      2017 to 2019: Reports of Back, Neck and Leg Pain

On February 10, 2017, Manlove again saw the plaintiff for a follow-up appointment about his pain. Dkt. No. 92 at ¶59. The plaintiff told Manlove that the neurosurgeon at the Spine Clinic "did nothing to help him and his pain was not being treated." Dkt. No. 95 at ¶33. When Manlove told the plaintiff he would not change his current regimen or prescribe him opioids for his pain, the plaintiff "became angry and argumentative." Id. Manlove ended the visit because the plaintiff had prescriptions for gabapentin, NSAIDs and Tylenol for his pain, "but he wanted opioids." Id.

Manlove avers that narcotics, including opioids, were not an appropriate course of treatment for the plaintiff because they "are not intended or recommended for long-term use for non-malignant pain management." Id. at ¶34. Manlove cites the Centers for Disease Control Guidelines for Prescribing Opioids and the Wisconsin Medical Examining Board Opioid Prescribing Guidelines. Id. (citing Dkt. Nos. 95-1, 95-2). He notes that the Department of Corrections limits its physicians from prescribing these medications because of their potential for abuse or hoarding. Id. at ¶35. He avers that opioids "have little value in the treatment of chronic pain" and, in a prison setting, are

"limited to treatment of short-term, well-defined pain," such as from an acute injury or recent operation. Id. at ¶36.

The plaintiff first reported neck pain during an appointment with Manlove on April 13, 2017. Dkt. No. 92 at ¶67. Manlove offered him an NSAID, but the plaintiff declined it. Id. at ¶68; Dkt. No. 93-2 at 28. Manlove ordered an x-ray of the plaintiff's cervical spine to address his complaints and to rule out a serious or urgent need, and he extended the plaintiff's lower-bunk restriction for six months. Dkt. No. 92 at ¶69; Dkt. No. 93-2 at 66. The x-ray results came back normal. Dkt. No. 92 at ¶69; Dkt. No. 93-2 at 184.

Nursing staff saw the plaintiff on May 17, July 10 and July 20, 2017 for his complaints of chronic pain. Dkt. No. 92 at ¶70. Staff noted that the plaintiff refused all interventions offered and was interested in narcotics only. Id. One nurse explained his prescribed medications, to which the plaintiff responded, "that shit don't work" and accused HSU staff of "doing nothing for [him]." Dkt. No. 93-2 at 27. He told another nurse he was "not saying to give [him] that [narcotics] but don't let [him] sit here in pain." Id. at 26. Staff flagged his chart for Manlove's review. Id. at 26–27.

On October 19, 2017, Manlove saw the plaintiff again for his complaints of lower back pain and nerve pain. Dkt. No. 92 at ¶71. The plaintiff was not in distress and his gait was normal. Id.; Dkt. No. 95 at ¶39. Manlove referred the plaintiff back to Choi for a pain consult. Dkt. No. 93-2 at 26, 64. The plaintiff saw Choi at Waupun Memorial Hospital for complaints of lower back and leg pain on January 19, 2018. Dkt. No. 92 at ¶73; Dkt. No. 93-2 at 88–90. Choi recommended bilateral facet joint injections into the plaintiff's spine, which he noted "may be helpful although there is no guarantee." Dkt. No. 93-2 at 88.

Manlove followed up with the plaintiff on February 2, 2018. Dkt. No. 92 at ¶75. The plaintiff reported no change in his symptoms and requested Lyrica, also known as pregabalin, which is a medication used to treat nerve pain. Id.; Dkt. No. 95 at ¶41. Manlove instead referred the plaintiff back to Choi for facet injections and ordered an EMG to evaluate the plaintiff for a pinched nerve. Dkt. No. 95 at ¶41. He noted he would consider pregabalin based on the results of the injections. Id.; Dkt. No. 93-2 at 23.

On February 19, 2018, the plaintiff complained that his back pain had worsened. Dkt. No. 92 at ¶77. Given the plaintiff's worsening symptoms, Manlove submitted a Non-Formulary Request to prescribe the plaintiff pregabalin. Id. at ¶78; Dkt. No. 93-2 at 23. Manlove avers that, like gabapentin, pregabalin is specifically indicated as a treatment for neurogenic pain. Dkt. No. 95 at ¶42. Pregabalin is not an approved medication within the Department of Corrections and may be prescribed only with the Medical Director's approval. Id. The Medical Director approved Manlove's request the same day. Id.; Dkt. No. 93-2 at 202–03.

With the Medical Director's approval, Manlove ended the plaintiff's gabapentin prescription and switched him to pregabalin. Dkt. No. 95 at ¶42; Dkt. No. 93-2 at 23. Before the plaintiff could begin taking pregabalin, however, he had to sign a Chronic Pain Management Agreement. Dkt. No. 95 at ¶43. Manlove says pregabalin is "is one of the most abused drugs in the corrections system," so incarcerated persons who wish to begin taking it must sign the agreement. Id. By signing the agreement, the incarcerated person agrees to several conditions, including the following: "I will take all medication provided to me as prescribed. I will not vary the dosage or interval without authorization from my primary care provider." Dkt. No. 93-2 at 247. Manlove notes that the

13

agreement applies to *all* medications, not just pregabalin or the medication for which the agreement was signed. Dkt. No. 95 at ¶43. The plaintiff signed the agreement on February 22, 2018. Id.; Dkt. No. 93-2 at 247.

On July 9, 2018, Manlove saw the plaintiff for complaints of neck pain and "shooting pains like electric shocks" down his right arm. Dkt. No. 92 at ¶84; Dkt. No. 93-1 at 20. Manlove noted that the plaintiff's back pain was stable. Dkt. No. 93-1 at 21. He referred the plaintiff for an EMG on his right arm and ordered a CT scan of his cervical spine to check for nerve root impingement. Id. Manlove also ordered a neurology consult to rule out cervical radiculopathy. Id.; Dkt. No. 95 at ¶44. On July 27, 2018, the plaintiff once again saw Choi, this time for bilateral lumbar facet joint injections. Dkt. No. 93-1 at 115–117. The plaintiff reported only a 20% reduction in his pain immediately after but acknowledged he would "still have to wait about a week from today to see if the injections was [*sic*] beneficial." Id. at 115.

On July 31, 2018, Manlove discontinued the plaintiff's pregabalin after prison officials concluded the plaintiff had misused his bupropion (an antidepressant) by "mouthing" it—presumably to trade, share or hoard it. Dkt. No. 92 at ¶87; Dkt. No. 93-1 at 20. By mouthing his bupropion, the plaintiff had violated his Chronic Pain Management agreement. Dkt. No. 95 at ¶46. Manlove avers that, even if the plaintiff's actions had not violated his agreement, he would have stopped the plaintiff's pregabalin if he believed the plaintiff was abusing or diverting any of his medications because of the danger it poses to other incarcerated persons.[1] Id.

---

[1] The plaintiff also received a conduct report on July 9, 2019, after security staff found unlabeled medications and Suboxone strips in his cell. Dkt. No. 92 at ¶123; Dkt. No. 94-1 at 4. He was found guilty of possession of intoxicants, possession of contraband and misuse of medication. Dkt. No. 94-1 at 4.

On August 16, 2018, Manlove met with the plaintiff for a follow-up from his steroid injections. Dkt. No. 92 at ¶91; Dkt. No. 93-1 at 19. The plaintiff reported that the injection "has been beneficial and has relieved his pain but not 100%." Dkt. No. 93-1 at 19. The plaintiff was upset that Manlove discontinued his pregabalin and insisted he had not misused his medications. Id. On September 20, 2018, the plaintiff again saw Manlove but was twenty minutes late to the appointment and complained it had been rescheduled. Id. He told Manlove he was "not getting adequate and timely health care" and that "nothing is being done about his 'cervical disc displacement.'" Id. The plaintiff again became agitated about his pregabalin being discontinued and further agitated when Manlove told him he would not restart his gabapentin because it also is "highly abusive medication." Id. The plaintiff refused Manlove's offer to provide ibuprofen, naproxen, acetaminophen or duloxetine and again requested an opioid. Id. Manlove noted that the plaintiff "became increasingly agitated and argumentative" and insisted "that he [was] not getting adequate healthcare and that [medical staff] [was] doing nothing to help him." Id. Manlove became uncomfortable and attempted to end the appointment, but the plaintiff refused to leave until Manlove threatened to call security. Id. The plaintiff told Manlove that he would file a complaint against him. Id.

On December 14, 2018, the plaintiff received bilateral sacroiliac joint injections from Choi. Dkt. No. 92 at ¶96; Dkt. No. 93-1 at 110–12. Within hours after receiving the injections, he reported a 90% to 100% reduction in pain and wrote that he felt "No pain finally." Id. at 113. A few days later, the plaintiff had a consultation at Lakeside Neurocare to rule out cervical radiculopathy. Id. at 104–07. The EMG study revealed a pinched nerve in his wrist, similar to carpal tunnel. Id.; Dkt. No. 95 at ¶50. A CT of his cervical

spine taken on January 3, 2019, showed mild to moderate degeneration. Dkt. No. 93-1 at 102. Manlove explains that the treatment for mild to moderate degenerative disk disease is similar to the treatment for lumbar disk displacement. Dkt. No. 95 at ¶52. He avers that drugs like pregabalin and gabapentin are not as helpful because there is no impinging of nerve roots and therefore no neurogenic pain. Id. It is instead "a wear and tear process like arthritis and often there is no truly good treatment." Id. at ¶53. Manlove says degenerative disk disease may prevent a pain-free life, so the goal is to reduce pain and allow the sufferer to live more comfortably. Id. He avers that the plaintiff "already had all of the tools he needed to achieve that goal. It was up to him to utilize those tools." Id.

On January 8, 2019, Manlove referred the plaintiff back to the University of Wisconsin Spine Center for further evaluation and treatment. Id. at ¶51; Dkt. No. 93-1 at 17. During appointments on February 7 and May 10, 2019, Manlove offered the plaintiff non-controlled analgesics or NSAIDs for his neck and back pain, but the plaintiff refused them. Dkt. No. 93-1 at 15–16. On October 30, 2019, the plaintiff saw Choi, who performed a CT scan that did not show "any evidence of disk displacement or anything that would cause his pain." Dkt. No. 93-4 at 1. He noted that the plaintiff "has had negative reactions to all types of injections." Id.

On December 13, 2019, the plaintiff saw Dr. Neimann (not a defendant) at the University of Wisconsin neurosurgery department for his chronic neck pain. Dkt. No. 92 at ¶105; Dkt. No. 93-3 at 393–99. Niemann suspected the plaintiff had degenerative disk disease of his cervical spine causing radiculopathy, but he could not fully assess the plaintiff without an MRI. Dkt. No. 93-3 at 399. The plaintiff could not undergo an MRI because of the bullet

fragments in his lower back. Id. Niemann instead recommended a CT myelogram of the plaintiff's cervical spine to create a possible treatment plan for his suspected radiculopathy. Id.; Dkt. No. 95 at ¶55.

    d.  Treatment in 2020; Dr. Manlove's Retirement

The plaintiff initially was scheduled for the CT myelogram before June 2020, when Manlove was to retire. Dkt. No. 92 at ¶106; Dkt. No. 95 at ¶56. The University of Wisconsin Hospital rescheduled the appointment twice because of the COVID-19 pandemic. Dkt. No. 92 at ¶106; Dkt. No. 93-3 at 385. The plaintiff received the myelogram on September 3, 2020, after Manlove retired. Dkt. No. 92 at ¶108; Dkt. No. 95 at ¶57. The results showed mild multilevel degenerative disk disease but no structural damage to explain the plaintiff's reported radicular symptoms on his right side. Dkt. No. 93-3 at 388–91; Dkt. No. 95 at ¶57. Manlove explains that this condition, like degenerative disk disease, often cannot be completely corrected and instead is treated to reduce pain and allow a more comfortable life. Dkt. No. 95 at ¶57.

    3.  *Nurse Meli's Involvement*

On August 5, 2018, the plaintiff filed a request for health services alleging his cervical disk displacement had gone untreated since 2015, and he was experiencing pain in his neck and arms and daily headaches. Dkt. No. 92 at ¶111; Dkt. No. 93-1 at 296. Nursing staff forwarded this request to Meli. Dkt. No. 93-1 at 296; Dkt. No. 97 at ¶14. Meli reviewed the plaintiff's medical file and saw that Manlove discontinued the plaintiff's pregabalin because of his misuse of his other medication. Dkt. No. 97 at ¶14. Because she has no authority to override a physician's prescription order, Meli confirmed that the plaintiff had an appointment to see an advanced care provider with whom he could discuss his medication and complaints of pain. Id. Meli explained her

action in her response to the plaintiff's request, which she sent on August 9, 2018. Dkt. No. 93-1 at 296.

Meli avers that based on her review of the plaintiff's medical records, it was clear that neither Manlove nor other medical staff were ignoring the plaintiff's complaints. Dkt. No. 97 at ¶15. She notes that in the six months before the plaintiff sent his August 5, 2018 request, Manlove had seen the plaintiff three times, nursing staff saw him an additional three times and the plaintiff had an offsite appointment with Choi, based on Manlove's referral. Id. She also notes the plaintiff had access to various treatments, including muscle cream, pain medication and a TENS unit. Id. He also had other scheduled offsite appointments. Id. Meli avers "[t]here was nothing further [she], as a nurse, could do for him." Id. Meli says she has no reason to believe HSU staff were not addressing the plaintiff's complaints. Id. at ¶16. She avers that all treatments were performed in accordance with his physician orders and nursing protocols. Id. at ¶17.

### 4. *Warden Foster's Involvement*

Warden Foster's only involvement with the plaintiff was his review of a November 26, 2018 request for information the plaintiff sent about his medical treatment. Dkt. No. 96 at ¶5. Foster followed up on the request with HSU staff, who confirmed that the plaintiff was receiving medical treatment, had up-coming offsite appointments and had access to pain medication. Id. Foster says he had no reason to believe HSU staff were misleading him about the plaintiff's treatment or that the plaintiff was being ignored. Id.

Foster responded to the plaintiff's request on December 7, 2018. Dkt. No. 93-1 at 165. He reminded the plaintiff that he had two upcoming offsite appointments to address his back issues, had an EMG to address the issues

18

with his right arm and had seen a registered nurse about his CT scans and to address his headaches. Id. He mentioned the conduct reports the plaintiff had received for misusing his medication, which led to discontinuation of his pregabalin. Id. He further reminded the plaintiff that he had a prescription for Tylenol for his pain. Id. Foster avers that if the plaintiff was dissatisfied with his response, he could have filed a formal grievance and the nursing coordinator would have reviewed it. Dkt. No. 96 at ¶6.

## II. Discussion

### A. Summary Judgment Standard

A party is entitled to summary judgment if it shows that there is no genuine dispute as to any material fact and it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Material facts" are those that "might affect the outcome of the suit." See Anderson, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." Id.

Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). To survive a motion for summary judgment, a non-moving party must show that sufficient evidence exists to allow a jury to return a verdict in its favor. Brummett v. Sinclair Broad. Grp., Inc., 414 F.3d 686, 692 (7th Cir. 2005).

### B. Eighth Amendment

As previously explained, the court reviews the plaintiff's claims of inadequate medical treatment under the Eighth Amendment, which "protects

19

prisoners from prison conditions that cause the wanton and unnecessary infliction of pain, including . . . grossly inadequate medical care." Gabb v. Wexford Health Sources, Inc., 945 F.3d 1027, 1033 (7th Cir. 2019) (quoting Pyles v. Fahim, 771 F.3d 403, 408 (7th Cir. 2014)) (internal quotations omitted). Not "every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." Estelle v. Gamble, 429 U.S. 97, 105 (1976). To proceed on this Eighth Amendment claim, the plaintiff must present evidence showing both that he "suffered from an objectively serious medical condition" and that the defendants were "deliberately indifferent to that condition." Petties v. Carter, 836 F.3d 722, 728 (7th Cir. 2016) (en banc) (citing Farmer v. Brennan, 511 U.S. 825, 834 (1994)); see Estelle, 429 U.S. at 103.

An objectively serious medical condition is one "that is so obvious that even a lay person would perceive the need for a doctor's attention." Greeno v. Daley, 414 F.3d 645, 653 (7th Cir. 2005). As the court explained in the screening order, the plaintiff's medical need "does not need to be life-threatening to be serious; it needs only to be 'a condition that would result in further significant injury or unnecessary and wanton infliction of pain' if not addressed." Dkt. No. 61 at 7 (quoting Gayton v. McCoy, 593 F.3d 610, 620 (7th Cir. 2010)).

 "[D]eliberate indifference describes a state of mind more blameworthy than negligence." Farmer, 511 U.S. at 835. A prison official shows deliberate indifference when he "realizes that a substantial risk of serious harm to a prisoner exists, but then disregards that risk." Perez v. Fenoglio, 792 F.3d 768, 776 (7th Cir. 2015) (citing Farmer, 511 U.S. at 837). An inmate's "dissatisfaction or disagreement with a doctor's course of treatment is generally

insufficient" to show the doctor was deliberately indifferent to a serious medical need. Johnson v. Dominguez, 5 F.4th 818, 826 (7th Cir. 2021)) (citing Johnson v. Doughty, 433 F.3d 1001, 1013 (7th Cir. 2006)). But neither may medical officials "doggedly persist[] in a course of treatment known to be ineffective." Greeno, 414 F.3d at 655. In short, the evidence must show that the plaintiff received treatment that was "'so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate' his condition." Id. at 654 (quoting Snipes v. DeTella, 95 F.3d 586, 592 (7th Cir. 1996)).

C.    Analysis

The court previously determined that the plaintiff's cervical and back issues constitute objectively serious medical needs. Dkt. No. 61 at 8. The defendants do not contest that finding or assert that the plaintiff's chronic conditions were not serious. Dkt. No. 98 at 8. The question is whether the defendants were aware of but disregarded the plaintiff's serious medical needs.

1.    *Dr. Manlove*

There is no evidence that Manlove persisted in the same course of treatment despite knowing it was ineffective. Greeno, 414 F.3d at 655. The undisputed evidence shows that Manlove and medical staff at Waupun frequently saw the plaintiff for treatment between 2014 and 2020 and provided varied and reasoned care in response to the plaintiff's complaints and gradual progress. Manlove avers that he followed a progressive treatment plan, beginning with conservative treatment and increasing the intensity when one course did not relieve the plaintiff's pain. Medical staff provided the plaintiff with different types of treatment in line with Manlove's plan, including topical muscle rubs and creams, a TENS unit and pain medications. Manlove first prescribed over-the-counter medications like ibuprofen, Tylenol, meloxicam

and duloxetine. When those proved ineffective, he prescribed stronger medications like gabapentin and pregabalin, for which he had to seek preapproval from the Medical Director. Manlove ordered the plaintiff CT scans, x-rays and EMGs; referred him to specialists at Waupun Memorial Hospital, the University of Wisconsin Spine Clinic and Lakeside Neurocare; and provided alternative treatments like physical therapy and steroidal injections. He provided the plaintiff extra medical restrictions at the prison including a lower bunk and an extra pillow.

The plaintiff claims Manlove unnecessarily delayed his treatment between June 2015 and April 2017. "A delay in treating non-life-threatening but painful conditions may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain." Arnett v. Webster, 658 F.3d 742, 753 (7th Cir. 2011) (citing McGowan v. Hulick, 612 F.3d 636, 640 (7th Cir. 2010)). The length of delay that is tolerable "'depends on the seriousness of the condition and the ease of providing treatment.'" Id. (quoting McGowan, 612 F.3d at 640).

The evidence shows that at a June 12, 2015 appointment, Choi recommended that the plaintiff receive a steroid injection for his back pain. The plaintiff asked "to think about his options." Dkt. No. 93-2 at 111. Four days later, HSU staff entered an order noting that the plaintiff "wants to think about it [the injection] reschedule as needed." Id. at 81. The same day, the plaintiff asked a nurse in the HSU for an appointment with Choi to receive the injection. The next day, June 17, 2015, Manlove entered an order to "Reschedule ESI [the injection with] Dr Choi." Id. It is not clear whether an appointment was scheduled. But on July 20, 2015, the plaintiff had a medical clearance appointment for his transfer to another prison. The nurse he saw

advised the plaintiff "to be proactive and upon transfer alert staff re: steroid injection." Id. During the month he was at the other facility, the plaintiff did not receive the steroid injection. When he was back at Waupun in October 2015, he again asked for the injection. A nurse made that appointment, which occurred on December 4, 2015. The plaintiff reported feeling "much better" a week after the injection. Id. at 38.

A reasonable jury could not view this evidence and conclude that Manlove unnecessarily delayed the plaintiff's appointment with Choi or that the six-month delay between appointments exacerbated his injury. First, there is no evidence that the plaintiff's pain worsened during those six months or that his condition deteriorated because of the delay. The evidence shows the plaintiff felt "much better" after the injection despite the delay. It also is undisputed that the HSU does not control the schedule of offsite providers. The HSU must work with providers and schedule appointments for incarcerated persons based on the provider's schedule. It is undisputed that Manlove ordered a rescheduled appointment for the plaintiff with Choi only one day after the plaintiff requested the injection. Although it is not clear whether that appointment ever was scheduled, it is undisputed that the HSU scheduler (and not Manlove) was responsible for scheduling the appointment with offsite physicians. Dkt. No. 95 at ¶12. Manlove cannot be held responsible for the delay caused by another prison employee not doing his or her job. See Burks v. Raemisch, 555 F.3d 592, 595 (7th Cir. 2009). The plaintiff was then prepped for a transfer to a different facility. There is no evidence that Manlove was responsible for that transfer, and he could not have been responsible for the plaintiff's treatment at the other prison. When the plaintiff returned to

Waupun, a nurse immediately processed his request for an appointment with Choi, which he received two months later.

The evidence shows that Manlove timely responded to the plaintiff's appointment requests and ordered appointments with Choi. The plaintiff's transfer between facilities and Choi's schedule contributed to the six-month wait between appointments. There is no evidence the plaintiff's appointment could have come sooner. Even if it could have, Manlove was not the person responsible for scheduling offsite appointments. A reasonable jury could not conclude that Manlove unnecessarily or intentionally delayed the plaintiff's follow-up appointment with Choi.

The plaintiff also claims that Manlove improperly discontinued his pregabalin. Dkt. No. 61 at 4–5. Manlove avers that he discontinued pregabalin because the plaintiff misused his bupropion by mouthing it, in violation of his Chronic Pain Management agreement. The plaintiff signed the agreement as a precondition to receive pregabalin. It is undisputed that by signing the agreement, the plaintiff agreed to take "all medication provided to" him, which included not just pregabalin but also the bupropion he was found to have misused. Dkt. No. 93-2 at 247; Dkt. No. 95 at ¶43. It is undisputed that diverting controlled medications, including bupropion, poses a danger to other incarcerated persons to whom the medication is not prescribed. Manlove avers that, for that reason, he would have discontinued the plaintiff's pregabalin had he learned of the plaintiff misusing or diverting any of his medications. Dkt. No. 95 at ¶46. The record shows Manlove had a reasonable basis for discontinuing the plaintiff's pregabalin. His decision reflects an exercise of medical judgment, not deliberate indifference to the plaintiff's pain. See Thomas v. Wahl, 590 F. App'x 621, 624 (7th Cir. 2014) (affirming summary

24

judgment for doctor who switched incarcerated person's medication from Vicodin "to a less efficacious nonnarcotic" because of incarcerated person's history of substance abuse "and the potential for misuse of controlled substances in prisons").

The evidence shows that after Manlove discontinued the plaintiff's pregabalin, he still provided the plaintiff alternate treatments that had less risk of abuse. He referred the plaintiff to Choi several times for injections, which at one point fully alleviated his pain. Dkt. No. 93-1 at 113. He continued offering NSAIDs and analgesics, which the plaintiff refused and again requested opioids or pregabalin. Manlove refused to resume those medications because of the plaintiff's conduct reports, and the plaintiff became agitated and angry. But the Eighth Amendment does not give an incarcerated person the right to direct his own medical treatment or demand certain medications. See Burton v. Downey, 805 F.3d 776, 785 (7th Cir. 2015); Arnett, 658 F.3d at 754. That Manlove did not provide the specific treatment the plaintiff requested (and for good reason) does not mean he was deliberately indifferent to the plaintiff's medical needs. See Anderson v. Schroeder, No. 16-cv-1543, 2018 WL 3130644, at *5 (E.D. Wis. June 26, 2018) (citing Thomas, 590 F. App'x at 624).

    2.    Nurse Meli

It is undisputed that Meli, in her administrative role, did not provide treatment or refer incarcerated persons for offsite appointments, and she could not override physician prescriptions orders. She instead deferred to advanced care providers who evaluated and treated incarcerated persons. The Seventh Circuit has held that, "[a]s a matter of professional conduct, nurses may defer to instructions given by physicians unless 'it is apparent that the physician's order will likely harm the patient.'" Holloway v. Delaware Cty. Sheriff, 700 F.3d

25

1063, 1075 (7th Cir. 2012) (quoting <u>Berry v. Peterman</u>, 604 F.3d 435, 443 (7th Cir. 2010)).

It also is undisputed that Meli had almost no involvement in the plaintiff's healthcare or treatment. Her only involvement was reviewing his request for health services in August 2018. Meli reviewed the plaintiff's medical records, which revealed he was receiving frequent and varied treatment. Meli concluded there was no suggestion that orders from Manlove or the HSU were likely to harm the plaintiff. She confirmed the plaintiff had an upcoming appointment with an advanced care provider because that was all she, as a nurse, could do. There is no evidence Meli could have done more to address the plaintiff's concerns. Nor is there evidence she *should* have done anything more because the plaintiff's medical records showed he was receiving frequent and adequate care from Manlove, nursing staff and offsite providers. Because Meli had no reason to believe the plaintiff's treatment posed a serious risk to his health, no reasonable jury could conclude that she was deliberately indifferent by deferring to the HSU's course of treatment for the plaintiff.

3. *Warden Foster*

It is undisputed that Warden Foster is not a medical professional, did not provide medical care to incarcerated persons and did not treat the plaintiff. As a non-medical prison official, Foster was entitled to "rely on the expertise of medical personnel," so long as he did not ignore the plaintiff. <u>Arnett</u>, 658 F.3d at 755; <u>Berry</u>, 604 F.3d at 440. The plaintiff claims that Foster failed to take action to address his pain and medical needs. Dkt. No. 61 at 9. But Foster did not ignore the plaintiff.

The undisputed evidence shows that Foster contacted HSU staff about the plaintiff's medical treatment in response to the plaintiff's November 2018

letter. HSU staff explained the treatment they were providing the plaintiff, including his upcoming offsite appointments to address his ongoing pain. They explained that the plaintiff misused his medication, so they discontinued it. Foster avers he had no reason to believe HSU staff were lying to him about the plaintiff's treatment, and there is no evidence suggesting they were. Foster passed this information on to the plaintiff in his December 2018 response and reminded the plaintiff of his current prescriptions and upcoming offsite appointments. The plaintiff could have grieved Foster's response, but there is no evidence that he did. Even if he had, neither Manlove nor HSU staff provided the plaintiff inadequate care, so Foster could not have been deliberately indifferent by not intervening in his medical care. No reasonable jury could conclude that Foster disregarded a serious risk to the plaintiff's health or safety.

4. *Conclusions of Law*

The undisputed evidence shows that Manlove provided the plaintiff constant, varied medical treatment for his back, neck and limb pain. When one treatment did not work, Manlove tried something new. When he was unsure how to proceed, he referred the plaintiff to an offsite specialist for evaluation and a treatment plan. There is no evidence suggesting this course of treatment was "blatantly inappropriate." Greeno, 414 F.3d at 654. The evidence shows that the plaintiff wanted medical treatment on *his* terms, not the prison's. He repeatedly requested opioids, which he said he had received when he was not in prison. But it is undisputed that opioids are rarely prescribed to incarcerated persons because of their high risk of abuse or misuse in the prison. Manlove instead provided several other pain medications that are less

likely to lead to abuse or misuse, including pregabalin—for which he had to receive preauthorization.

Incarcerated persons are "not entitled to demand specific care" and are "not entitled to the best care possible. [They are] entitled to reasonable measures to meet a substantial risk of serious harm." <u>Forbes v Edgar</u>, 112 F.3d 262, 267 (7th Cir. 1997). On this record, no reasonable jury could conclude that Manlove disregarded the plaintiff's pain by not providing him opioids or failing to provide adequate treatment. Because the evidence does not show Manlove or the HSU provided inadequate treatment, there was no risk of which Meli or Foster could have been aware yet disregarded. The defendants are entitled to judgment as a matter of law.[2]

## III. Conclusion

The court **GRANTS** the defendants' unopposed motion for summary judgment. Dkt. No. 91.

The court **ORDERS** that this case is **DISMISSED**. The clerk will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. <u>See</u> Federal Rules of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or

---

[2] Because the court is granting summary judgment to all three defendants on the merits, it need not analyze their claim that they are entitled to qualified immunity. <u>See</u> <u>Sierra-Lopez v. County</u>, No. 17-CV-1222, 2019 WL 3501540, at *10 (E.D. Wis. July 31, 2019) (citing <u>Viero v. Bufano</u>, 925 F. Supp. 1374, 1387 (N.D. Ill. 1996); and <u>Antepenko v. Domrois</u>, No. 17-CV-1211, 2018 WL 6065347, at *6 (E.D. Wis. Nov. 20, 2018)).

excusable neglect for not being able to meet the 30-day deadline. <u>See</u> Federal Rule of Appellate Procedure 4(a)(5)(A).

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. <u>See</u> Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. <u>See</u> Federal Rule of Civil Procedure 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 7th day of October, 2022.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**United States District Judge**